IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 12, 2004 Session

**STATE OF TENNESSEE v. JOSEPH BARAJAR**

**Appeal from the Criminal Court for Davidson County**
**No. 2002-B-1120      J. Randall Wyatt, Jr., Judge**

_____

**No. M2003-02844-CCA-R3-CD - Filed January 27, 2005**

_____

The defendant, Joseph Barajar, originally charged with premeditated first degree murder, was convicted of second degree murder. The trial court ordered a twenty-five-year sentence in the Department of Correction. In this appeal of right, the defendant challenges the sufficiency of the evidence, cites error in the admission of the evidence, and asserts that his sentence is excessive. See Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004). The sentence must be modified to twenty-two years; otherwise, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed as Modified**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

Cynthia M. Fort (on appeal), Glenn Funk (at trial), and Kevin McGee (at trial), Nashville, Tennessee, for the appellant, Joseph Barajar.

Paul G. Summers, Attorney General & Reporter; Michelle Chapman McIntire, Assistant Attorney General; and Katrin Miller and Chris Buford, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

On February 24, 2002, the defendant telephoned 911 to report that the victim, Patricia Barker, age 36, had committed suicide. He was subsequently charged with her first degree murder.

At trial, the proof established that the victim and the defendant, who had been involved in a romantic relationship, lived together at the Chimneytop Apartments in Antioch. At the time of her death, however, the victim was in the process of ending the relationship and moving to Kentucky.

The victim's daughter, Bonnie Ann Jett, who was living with the victim and the defendant until shortly before the murder, testified that in early 2002, the victim ended her relationship with the defendant and, while she still resided at the apartment in Antioch on a part-time basis, planned

to move to Kentucky. Ms. Jett, who was sixteen years old at the time of the offense, had already changed her residence to that state by the time of the offense. She recalled that on February 16, she and the victim had returned to the apartment to move some of their things when the defendant threatened to throw the victim over the balcony, warning that if she left him, he would find her. Ms. Jett contacted the police at that time, but no arrest was made. Ms. Jett recalled that some five weeks earlier, the victim had telephoned her at work and abruptly hung up. She remembered that the victim, who was crying and shaking, arrived fifteen minutes later, explaining that she had hung up the phone inadvertently because the defendant had been choking her. According to Ms. Jett, the victim reported that the defendant threatened to kill her, "chas[ed] her with a knife," and made "some kind of signal that was the kiss of death." She stated that shortly thereafter, the defendant arrived and another employee, Bob Maxwell, helped the victim call the police. Ms. Jett denied that the victim had ever expressed a desire to commit suicide and identified the knife found at the crime scene as belonging to the defendant.

During cross-examination, Ms. Jett acknowledged that two months before the stabbing, a thirty-five-year-old co-worker named Clarence Crawford had asked her on a date and that later, the victim intervened when Crawford began "harass[ing] her." Ms. Jett testified that the victim made a complaint to her employer, the Steak and Shake restaurant, and telephoned the manager, resulting in Crawford's suspension.

Danny Wayne Poe, the victim's brother, testified that he helped the victim and his niece move on February 16. He recalled hearing the defendant tell the victim "that she wasn't leaving, or he'd . . . destroy her stuff." According to Poe, the defendant left when they summoned the police.

Maria D'Angelo, a resident of Chimneytop Apartments at the time of the offense, testified that at 2:00 a.m. on February 24, 2002, she was parking her vehicle when a man she later identified as the defendant stopped his vehicle and asked whether she had a cellular telephone. When she replied in the negative, he said, "[P]lease, I need a phone. My girlfriend killed herself." Ms. D'Angelo then called 911, handed her cell phone to the defendant, and, at the 911 operator's request, went to the defendant's apartment to check on the victim. According to Ms. D'Angelo, the victim, who was lying on her back in the living room, had no pulse; there were bloodless "stab marks" on her arms, as if they "had been wiped off." She recalled that the defendant, who initially just "stood there," eventually knelt over the victim and "just kept putting his hands on her stomach." She also remembered that his hair was wet. Ms. D'Angelo testified that when she commented that "this doesn't make sense," the defendant became angry, yelled at the victim, and kicked a trash can.

The audiotape of the defendant's 911 call was introduced as evidence. During the call, the defendant denied that the victim had threatened suicide, but told the operator that she had previously voiced concern over bills. When asked to go check on the victim, the defendant replied, "She's not breathing I'm telling you now. I already checked. I grabbed her. I hugged her." The tape established that he repeatedly refused to perform CPR, insisting that she was not breathing and had "no pulse at all."

Allen Welch, a paramedic with the Nashville Fire Department, arrived at the scene at approximately 3:00 a.m. He testified that the victim was on the floor, her right arm draped over her face and a lock-back-type knife in her bloody right hand. Welch found dried blood in the victim's hair and on the carpet and detected rigor mortis in the body, which had "a waxy kind of pallor."

Metro Police Officer Andy Hodges, the first officer to arrive at the scene, passed the defendant on his way to the apartment and heard him say, "I believe my girlfriend's dead. I think she's killed herself." He testified that later, while he was transporting the defendant to the police station for an interview, the defendant said "something to the effect of you-all better not take me home tonight. I'm afraid I'll hurt myself if you do. Don't leave me alone tonight." During cross-examination, Officer Hodges acknowledged that on January 5th, he had responded to a call to the same apartment involving a disturbance between the victim and the defendant. He recalled discovering that they had only been engaged in a verbal altercation and driving the defendant to a friend's residence to spend the night. The officer testified that later on the same day, he received a second call indicating that the victim and the defendant were in an argument at a Steak and Shake restaurant. He stated that on that occasion, the victim did not inform him that the defendant had choked her or chased her with a knife.

On the night of the stabbing, Officer David Henry Veile was assigned to stay with the defendant while the apartment was secured. He recalled that the defendant, who was crying, had informed him that there was a sheet over the body when he arrived at the apartment. Officer Veile testified as follows:

> He told me that he had been with a friend of his named Tex, a [C]hristian friend named Tex. They had been at a bar at the intersection of Murfreesboro and Thompson Lane. He couldn't remember the name of the bar. . . . [The defendant] told me that he had told Tex that [the victim] was going to frame [him], but [he] had no idea she would do this.

The officer, who did not observe any signs of forced entry, found two cigarette butts immediately outside the door of the apartment.

Identification Officer Thomas Simpkins found no fingerprints on the knife recovered at the scene, but did observe that the small amount of blood on the handle was not consistent with its location in the victim's hand. It was Officer Simpkins' opinion that the blade of the knife had not been wiped clean, but that the handle could have been. He testified that he did not detect any blood on the defendant's car.

Identification Officer Raymond Rader, Jr., testified that he processed the bathroom area of the apartment for blood. None of the items he tested were positive for blood.

The deposition of William Tex Ramey, Jr., who was not available for trial, was read into evidence. As the purchasing manager at Apex Supply, he confirmed that the defendant worked in

the warehouse at the time of the murder. Ramey recalled that on February 23, 2002, he employed the defendant to help with some projects at his residence. He stated that the defendant arrived at approximately 10:30 a.m. and left shortly after 6:00 p.m. Ramey remembered that he paid the defendant $40 in cash and invited him to spend the night. He testified that the defendant, who did not have any visible scratches on his face, arms, or hands, declined his invitation. According to Ramey, the defendant told him that he was "having problems" with his girlfriend and that she was "going to close the lease" on him.

Identification Officer George Bouton, who was also unavailable for trial, testified by videotape. He stated that he arrived at the scene at approximately 4:15 a.m. and collected three wet washcloths from the wet bathtub. Officer Bouton recalled that he also collected some paper fragments, two pairs of athletic shoes, and the knife that was in the victim's hand. According to Officer Bouton, he used luminol spray to find three or four glowing areas of blood on the wall above the bathtub and near the metal drain.

The following stipulation was presented to the jury:

After Officer George Bouton conducted the luminol test on the bathroom, the Metro Police Department conducted other scientific tests and determined that there was, in fact, no blood or blood residue found anywhere in the bathroom or on any object in the bathroom . . . .

Charles Linville, another Metro Police Identification Officer, recovered two cigarette butts from outside the door of the apartment and a beer bottle from the living room. He testified that he also found a clump of hair matching that of the victim and a blue blanket near the body.

Metro Homicide Detective Johnny Ray Crumby, Jr., who also assisted in the investigation, testified that he observed a portable telephone on a bedroom dresser. He recalled that officers found a blood transfer on the "left hall wall, near the doorjamb, going into the bathroom" and no signs of forced entry. According to the detective, none of the neighbors had information about the crime and his search of surrounding dumpsters and shrubbery did not produce any physical evidence. He stated that after interviewing the defendant, who claimed that he had been staying at a Traveler's Court Inn, he confirmed with the manager that the defendant had registered there and had checked out two days before the stabbing. His investigation established that the motel room had been cleaned and no personal items remained.

Chris Dudiak testified that two days before her body was discovered, the victim, whom he had met through work, joined him for dinner at the Outback Steakhouse. He recalled that they later rented a motel room at the Knight's Inn and engaged in sexual relations. Dudiak acknowledged that he had initially failed to tell police about his sexual encounter with the victim but later admitted the tryst and provided a blood sample for DNA comparison after semen was found in the victim's vagina. Dudiak explained that it was his belief that the victim did not have a boyfriend and that they went to a motel because her daughter was at her apartment.

Sudha Prema, the desk clerk at the motel, testified that the motel's records indicated that the victim checked in at approximately 8:45 p.m. on February 22. She explained that check-out time was shown as 11:35 a.m. on the next day, which would have been when the maid had returned the key to the clerk.

Andrea House worked with the defendant at Apex Supply Company for four or five months before his arrest. She testified that during the three weeks preceding the murder, the defendant confided to her that the victim had paid half of the rent and the electric bill for their apartment and had the power turned off. According to Ms. House, the defendant told her that "he had taken a bunch of pills . . . because he wanted to die." She recalled that approximately two days before the victim's death, the defendant stated, "I can't believe she left me, that bitch," and, "I hate women."

Clarence Crawford, Jr., who had been warned by the victim to stay away from her daughter, adamantly denied having killed her. He acknowledged that he had previously worked with Ms. Jett at the Steak and Shake and that a month or so before the murder, he had called her from the restaurant and had a "little argument" over the nature of their relationship. He acknowledged that his employment was later suspended for using the office phone to make the call. Crawford conceded that the victim had telephoned him at his residence and warned him to stay away from her daughter. He stated that he had complied with her directive and had had no further contact with either of them.

Homicide Detective Robert Swisher, who questioned the defendant at the scene, recalled that he claimed to have been putting up shelving at the residence of Tex Ramey until approximately 6:30 p.m. According to the detective, the defendant stated that he returned to the apartment thirty to forty minutes later, changed clothes, and left before the victim arrived. Detective Swisher testified that when he examined the body, he saw small white paper towel fibers around her hand and observed that a clump of hair had been pulled from her head. He recalled that there was a bloody pair of size 33/31 blue jeans, the size worn by the defendant, on the couch and that on the floor there were a pair of white men's tennis shoes and a pair of black socks, both covered in blood. Detective Swisher found a duffel bag packed with the victim's clothing and personal effects near her feet. He saw blood splatter on a wall and lamp shade in the living room, as well as a smear of blood on the wall in the hallway near the bathroom. Later, Detective Swisher assisted Detective Crumby in the interview of the defendant, a redacted videotape of which was presented as evidence. He testified that the officers observed scratch marks and small abrasions of the defendant's face, neck, shoulder, and chest.

Although some portions of the tape were inaudible, the defendant told the officers that he had worked at the Ramey residence all day and then spoke with the victim at exactly 6:50 p.m., calling her from a pay telephone to tell her that he was on his way home. He stated that he arrived at the apartment at 7:35 p.m., changed his clothes, and left. The defendant claimed that the victim was not at the residence during that time, but that he saw her as he was leaving. He told the officers that he went to several bars that evening, drank a total of three beers, and returned to find the apartment door open and the victim dead. According to the defendant, there was no telephone in the apartment and, because he could not find the victim's cellular telephone, he went downstairs where he met Ms.

D'Angelo, who had a cell phone. He contended that when he and Ms. D'Angelo went into the apartment to check on the victim after calling 911, he kicked at his shoes, which were on the floor near the body, because he was "pissed off," thereby getting blood on them. The defendant told the officers that the victim, who had been driving back and forth to Kentucky to see her mother, had returned to Nashville on the preceding Thursday and that they had checked into the Traveler's Inn because the electricity in the apartment had been turned off. He stated that he turned the electricity on the next day and that the victim had gone out with "some guy" that evening and had not returned to the apartment until 11:00 p.m. According to the defendant, he was seeing other women and the victim, who was taking Zoloft and Xanax, could not accept his preference to be "just roommates." He contended that at the time of her death, the victim was being sued by a bank in Germantown and was "very disturbed." The defendant maintained that he had received scratches on his face and hands while working at the Ramey House. He denied that he and the victim ever fought, asserting to the officers that he did not "fight women." When the officers voiced their suspicion that he had stabbed the victim, the defendant responded by cursing and, ultimately, requesting that the questioning "cease."

Special Agent Hunter Greene, a serologist with the TBI, discovered the presence of sperm on the vaginal swab taken from the victim. He testified that DNA testing revealed Chris Dudiak to be the donor. Special Agent Greene recalled that DNA testing of fingernail scrapings taken from the victim's left hand revealed the victim's own profile. He found evidence of another partial profile under the nails of her right hand but was not able to either include or exclude anyone. Testing confirmed that the victim's blood was on her shirt, a blanket found with the body, and the jeans and tennis shoes found in the living room. According to Special Agent Greene, DNA testing of the two cigarette butts found outside of the apartment door demonstrated that one was smoked by the defendant and the other by an unknown male.

Dr. Thomas Deering, who performed the autopsy, determined the cause of death to be homicide. He testified that the victim, whose drug and alcohol screens were negative, had sustained approximately twenty-three separate stab wounds. Dr. Deering characterized the wounds to the hands as defensive. It was his opinion, based on bleeding patterns, that the victim was initially face down and was rolled over later. Dr. Deering was also of the opinion that the knife was placed in the victim's hand after her death.

The defendant did not present any evidence.

I

Initially, the defendant claims that the trial court erred by permitting Bonnie Ann Jett to testify regarding the aborted January 5 telephone call from the victim and the victim's subsequent statement that she had been choked by the defendant. The state contends that the testimony was admissible pursuant to the excited utterance exception to the hearsay rule and was relevant to show motive on the part of the defendant.

After a hearing conducted outside the presence of the jury pursuant to Tennessee Rule of Evidence 404(b), the trial court determined that Ms. Jett's testimony was relevant and admissible. It stated as follows:

I do think that this [testimony] is relevant . . . . I think it goes to intent. I think it goes to motive. . . .

[T]his, obviously, would be something that would be hearsay, because it's a statement made by [the victim] to her daughter. But the [c]ourt finds that this is a case where you have the exception of an excited utterance. I think . . . that this woman was . . . in a state of excitement and in a state of fear. . . .

[T]he [c]ourt . . . is of the opinion that the prejudicial effect of this does not outweigh the probative value . . . .

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," Tenn. R. Evid. 801(c), and is generally inadmissible, Tenn. R. Evid. 802. "The following are not excluded by the hearsay rule: . . . [a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). In State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997), our supreme court observed that there are three requirements of the excited utterance hearsay exception: (1) that there be a startling event or condition; (2) that the statement "relate to" the startling event or condition; and (3) that the statement be made while the declarant is under the stress or excitement generated by the event or condition. With regard to the last requirement, our high court ruled as follows:

In State v. Smith . . . we said that "[t]he ultimate test is spontaneity and logical relation to the main event where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." The time interval is but one consideration in determining whether a statement was made under stress or excitement:

Other relevant circumstances include the nature and seriousness of the event or condition; the appearance, behavior, outlook, and circumstances of the declarant, including such characteristics as age and physical or mental condition; and the contents of the statement itself, which may indicate the presence or absence of stress.

Id. (citations omitted). Whether a statement qualifies as an excited utterance is left in great measure to the discretion of the trial judge. State v. Payton, 782 S.W.2d 490, 494 (Tenn. 1989).

Of course, the statements made by the victim to Ms. Jett on January 5 qualify as hearsay: they were made by the victim outside of the trial and offered to prove the truth of the matter asserted, i.e., that the defendant had attacked and attempted to strangle the victim in the month preceding her death. Any attack upon the victim would have qualified as a startling event, however, and there is evidence to support the finding that the victim was laboring under the stress thereof at the time she made the statements. Ms. Jett testified that the victim was crying and shaking when she arrived at her place of employment almost immediately after the assault. Another employee who overheard the statements of the victim was sufficiently concerned to call the police. Under these circumstances, it is our view that the trial court did not abuse its discretion by determining that the victim's statements were admissible subject to the excited utterance exception.

The defendant also asserts that the testimony should have been excluded under Tennessee Rule of Evidence 404(b). That rule provides as follows:

> Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing inquiry on cross-examination about specific instances of conduct are:
> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). A fourth prerequisite to admissibility is that the trial court find by clear and convincing evidence that the defendant committed the other crimes or bad acts. State v. DuBose, 953 S.W.2d 649, 654 (Tenn. 1997).

Rule 404 was patterned in great measure on State v. Parton, 694 S.W.2d 299 (Tenn. 1985), wherein our supreme court ruled that evidence of other crimes is generally inadmissible. The terms of this rule establish that character evidence cannot be used to prove that a person has a propensity to commit a crime. Tenn. R. Evid. 404(b); State v. Adkisson, 899 S.W.2d 626 (Tenn. Crim. App. 1994). Most authorities suggest that trial courts take a "restrictive approach of 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][e] (4th ed. 2000). That perhaps best explains the traditional posture of the courts that any testimony of other bad acts by a defendant is not usually admissible when used as substantive evidence of guilt of the crime on trial. Parton, 694 S.W.2d at 302-03. In those instances where the other conduct or acts are similar to the crimes on trial, the potential for a prejudicial result increases. State v. Bordis, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995).

Unlike the Federal rule barring such evidence, our rule does not specifically enumerate the purposes for which such evidence may be offered. State v. Gilliland, 22 S.W.3d 266, 271 (Tenn. 2000). The Advisory Commission specifically omitted such a list so that lawyers and judges would "'use care in identifying the issues to be addressed by the Rule 404(b) evidence.'" Id. (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 404.6, at 169 n.457 (3d ed. 1995)). Therefore, in every case in which evidence of other crimes, wrongs, or acts is offered, the trial court should carefully scrutinize the relevance of the evidence and the reasons for which it is being offered. Id. Although Rule 404(b) does not explicitly list these exceptions, our courts have held that evidence of other crimes may be admissible to show motive, intent, guilty knowledge, identity of the defendant, absence of mistake, and the existence of a common scheme or plan. See, e.g., Collard v. State, 526 S.W.2d 112, 114 (Tenn. 1975); see also Cohen, supra § 4.04[8]. Even if the challenged evidence is relevant to an issue other than character, it must be excluded if the danger of unfair prejudice outweighs the probative value of the other crime evidence. State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993); see also State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985); State v. Taylor, 669 S.W.2d 694 (Tenn. Crim. App. 1983). Because the trial court substantially complied with the requirements of Rule 404(b), this court will review the trial court's determination for an abuse of discretion. See DuBose, 953 S.W.2d at 652.

The trial court found by clear and convincing evidence that the defendant had assaulted the victim by choking her. The record supports the trial court's determination that the testimony was offered not as evidence of the defendant's character, but as evidence of the nature of the relationship between the defendant and the victim, as well as of the defendant's intent and motive. "[V]iolent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993); see also State v. Turnbill, 640 S.W.2d 40, 46-47 (Tenn.Crim.App.1982); State v. Glebock, 616 S.W.2d 897, 905-906 (Tenn.Crim.App.1981). The trial court specifically found that the probative value of Ms. Jett's testimony outweighed the danger of unfair prejudice. In our view, the trial court did not abuse its discretion by admitting Ms. Jett's testimony about the events of January 5.

II

Next, the defendant contends that the trial court erred by admitting the testimony of Danny Wayne Poe, who said that he had heard the defendant threaten to "bust up . . . and destroy [the victim's] stuff" eight days before the stabbing. The defendant claims that the testimony was both inadmissible hearsay and inadmissible evidence of a prior bad act.

While the trial court did not address the hearsay issue, statements by a party-opponent, including a defendant in a criminal case, are not excluded by the rule against hearsay. Tenn. R. Evid. 803(1.2) ("The following [is] not excluded by the hearsay rule: A statement offered against a party that is . . . the party's own statement . . ."); State v. Janalee Annette Wilson, No. W2002-02402-CCA-R3-CD (Tenn. Crim. App., Jackson, Oct. 3, 2003); see also Fed. R. Evid. 801(d)(2) (admissions by party-opponent are not hearsay under the Federal Rules of Evidence). This

statement, however, is an expression of intent and would therefore also be admissible under the "state of mind" exception to the hearsay rule. See Tenn. R. Evid. 803(3) (providing hearsay exception for "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)"). While such evidence may sometimes be too remote in time to be probative, the defendant's threat in this instance was made just days before the victim's murder and in the context of the victim's effort to move out of the apartment the two had shared. The Advisory Commission Comments to Rule 803(3) provide that "[c]ombining the hearsay exception with relevancy principles, declarations of mental state will be admissible to prove mental state at issue or subsequent conduct consistent with that mental state." Tenn. R. Evid. 803(3), Advisory Comm'n Comments. In our view, the evidence was properly admitted under the applicable hearsay rules. See State v. Andrew W. Keeley, No. 01C01-9403-CR-00095 (Tenn. Crim. App., at Nashville, Aug. 25, 1995) (holding that evidence of defendant's prior threat to kill the victim, made while victim "was trying to get him to leave her apartment" several weeks prior to her murder, was properly admitted pursuant to Tenn. R. Evid. 803(1.2)).

Additionally, it is our view that the trial court properly determined that the testimony was admissible under Tennessee Rule of Evidence 404(b). The trial court ruled as follows:

> The [c]ourt believes that this evidence . . . goes to . . . two points. And that is, the motive and the intent in this case. Although motive is not necessarily an issue, it is important as to other matters, such as identity or intent. And intent is, obviously, relevant to the defendant's guilt or innocence . . . in this case. From the opening statements, voir dire, and everything that I've heard, it's obvious that the defendant is not denying that [the victim] lost her life . . . but that [he is claiming that] he is not the person who did it and . . . had no motive, nor the intent to do it.
> The [c]ourt is of the opinion . . . that the incident on February the 16th . . . is relevant. It does go to the relationship and the motive and the intent of these persons. [The victim] was, apparently, deciding to move back to . . . Mayfield, Kentucky, leaving her relationship with this man. And the incident on February the 16th, having to do with the argument and the threats to throw her over the balcony, . . . that she . . . could leave, but she wouldn't get far, that he knew . . . where to find her. That all has to do with threats of [the defendant] towards [the victim]. And I think it's relevant as to the intent and the motive, possibly even identity. . . .
> I think all of this goes to the relationship and . . . the volatile nature of . . . the relationship.

The evidence was relevant to establish the defendant's motive, intent, and state of mind as the victim ended their relationship and moved from their residence. Given the close proximity in time to the murder, the evidence was highly probative and its relevance outweighed the danger of any unfair prejudice. The trial court did not abuse its discretion.

-10-

III

The defendant next argues that the trial court erred by allowing former co-worker Andrea House to testify that he had previously remarked that he "hated women." The record reflects that during Ms. House's direct testimony, defense counsel objected to the admission of any statements made by the defendant. After again determining that the statements were relevant to intent, motive, and state of mind, the trial court overruled the objection.

In our view, the testimony of Ms. House was admissible under the "state of mind" hearsay exception contained in Tennessee Rule of Evidence 803(3). The defendant's statements indicated his emotional state as it pertained to the victim immediately prior to the murder. While the defendant's comment that he "hated women" was broad, it was nevertheless relevant to reflect his attitude toward the female victim with whom he had had an intimate relationship. See State v. Middlebrooks, 840 S.W.2d 317, 330 (Tenn. 1992) (holding that the trial court correctly admitted "testimony about the defendant's statement evidencing his dislike for blacks under the state of mind exception to the hearsay rule").

IV

The defendant also asserts that the trial court violated his right to a fair trial by limiting evidence suggesting that Clarence Crawford was the perpetrator of the crime.

Prior to Crawford's testimony, defense counsel sought permission to question the witness about his "propensity for violence." The trial court limited defense counsel to impeaching Crawford's credibility with prior convictions. During cross-examination, Crawford acknowledged that he was "a convicted drug dealer" who had been arrested "sitting on top of a High Point nine-millimeter handgun." After Crawford denied that he was "a violent man," the trial court allowed defense counsel to question him about three different assault arrests. While the trial court expressed the intent to prohibit any extrinsic evidence of the assaults in the event of a disavowal, Crawford acknowledged each of the incidents. In this appeal, the defendant contends that "it was constitutional and not harmless error to restrict the ability of the defense to develop a line of questioning that would have exposed Crawford's violent nature and also, error in light of that ruling not to allow the defense to present other witnesses who could have testified to this reputation for violence."

Generally, "[e]vidence of a person's character . . . is not admissible for the purpose of proving action in conformity with the character . . . on a particular occasion." Tenn R. Evid. 404(a). This matter is governed by Tennessee Rule of Evidence 608, which provides in pertinent part as follows:

(a) Opinion and Reputation Evidence of Character. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to

character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked.

(b) Specific Instances of Conduct. Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's credibility, other than convictions of crimes as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness or concerning the character for truthfulness or untruthfulness of another witness as to which the character witness being cross-examined has testified. The conditions which must be satisfied before allowing inquiry on cross-examination about such conduct probative solely of truthfulness or untruthfulness are:

(1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry;

(2) The conduct must have occurred no more than ten years before commencement of the action or prosecution, . . .; and

(3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conduct before trial, and the court upon request must determine that the conduct's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination. . . .

Tenn. R. Evid. 608(a) – (b) (emphasis added).

In our view, the initial ruling by the trial court that the defendant was limited to the impeachment of Crawford with his prior convictions was correct. Rule 608 requires that reputation evidence and evidence of other bad acts must be probative of the truthfulness or untruthfulness of the witness in order to be admissible for impeachment purposes. None of the three assaults for which the defendant had been arrested but not convicted would qualify. Moreover, under Rule 608(b), extrinsic evidence of other bad acts is never admissible. See State v. Reece, 637 S.W.2d 858, 861 (Tenn. 1982).

The defendant also makes a due process claim that he was denied the opportunity to present a complete defense. Under the Due Process Clause of the Fourteenth Amendment, criminal defendants must be afforded a meaningful opportunity to present a complete defense. California v. Trombetta, 467 U.S. 479 (1984). In State v. Brown, which concerned the application of Tennessee's rape shield law, our supreme court stated as follows:

The constitutional right to present a defense has been held to "trump" the rule against hearsay in at least two United States Supreme Court decisions. . . .

The facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence. Generally, the analysis should consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important. . . .

29 S.W.3d 427, 433 (Tenn. 2000) (citations and footnotes omitted).

In our assessment, the trial court's limitations did not work to deprive the defendant of his right to present a defense. During his cross-examination of Crawford, defense counsel was able to present the jury with the circumstances of each of his three assaults. Thus, the jury ultimately had information that Crawford had previously been accused of threatening to kill a woman with a handgun on one occasion, striking a man with a beer bottle on another, and, on a third occasion, dumping garbage on the front porch of a man while threatening to "beat [him] down." Through the testimony of Ms. Jett and Crawford, there was ample evidence of the antagonistic relationship between the victim and Crawford. The record includes testimony that the victim had confronted Crawford about his relationship with Ms. Jett and that he was fired from his job at the Steak and Shake because of her complaints. In our view, the defendant was successful in presenting proof that Crawford had engaged in violent acts in the past and had a motive to kill the victim. The jury nevertheless determined, as was its prerogative, that he did not commit the murder. There was no constitutional violation.

V

The defendant asserts that the evidence was insufficient to support his conviction. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

A criminal offense may be established exclusively by circumstantial evidence. Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 456-58 (1958); State v. Hailey, 658 S.W.2d 547, 552 (Tenn. Crim. App. 1983). If entirely circumstantial, the facts and circumstances must "be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 225 Tenn. 478, 470 S.W.2d 610, 612 (1971). In such an event, the circumstantial evidence must be both consistent with guilt and inconsistent with innocence. Pruitt v. State, 460 S.W.2d 385, 3990 (Tenn. Crim. App. 1970). The weight of the circumstantial evidence is for the jury to determine. Williams v. State, 520 S.W.2d 371, 374 (Tenn. Crim. App. 1974) (citing Patterson v. State, 4 Tenn. Crim. App. 657, 475 S.W.2d 201 (1971)). The court may not substitute its inferences for those drawn by the trier of fact in circumstantial evidence cases. Liakas, 286 S.W.2d at 859; Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). The same standard of review is applicable whether the guilty verdict was based upon direct evidence or upon circumstantial evidence. State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 208 Tenn. 75, 343 S.W.2d 895, 897 (1971).

Second degree murder is "a knowing killing of another." Tenn. Code Ann. § 39-13-210(a). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]" Tenn. Code Ann. § 39-11-106(a)(20).

Although circumstantial, the evidence in the record is sufficient to support the defendant's conviction for second degree murder. The proof at trial demonstrated that the defendant was disgruntled at the victim's decision to terminate their relationship and move to Kentucky. There was testimony that the defendant had previously assaulted the victim and had threatened her in the presence of others. Although the defendant initially claimed that the victim had committed suicide, the victim had been stabbed twenty-three times, including wounds to the back. The defendant admitted ownership of the knife used in the crime. Two witnesses testified that it appeared as though the knife had been placed in the victim's hand after her death, perhaps after the beginning of rigor mortis. Ms. D'Angelo testified that the defendant's hair was wet when he asked for her phone in the parking lot and there was evidence that someone had recently taken a shower in the apartment that had been shared by the victim and the defendant. The defendant's clothing and shoes, found in the living room with the body, were covered with blood. There were no signs of forced entry. Clarence Crawford, implicated in the crime by the defendant, denied killing the victim and his testimony was implicitly accredited by the jury. In our assessment, the evidence qualifies as "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant."

VI

Finally, the defendant contends that his sentence is excessive under Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004). The state contends that the defendant has waived the issue by failing to raise it at trial and that the twenty-five-year sentence is warranted even in light of Blakely.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by

-14-

the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

In calculating the sentence for a Class A felony conviction, the presumptive sentence is the midpoint within the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If there are enhancement factors but no mitigating factors, the trial court shall set the sentence at or above the midpoint. Tenn. Code Ann. § 40-35-210(d). If there are mitigating factors but no enhancement factors, the trial court shall set the sentence at or below the midpoint. Id. A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence should then be reduced within the range by any weight assigned to the mitigating factors present. Id.

At the sentencing hearing, Bonnie Jett testified that there was a history of abuse between the defendant and the victim. She stated that in September of 2001, while they were moving into the Chimneytop Apartments, the defendant attacked her after she placed some boxes into the back of the victim's pickup truck rather than in the U-Haul trailer. Ms. Jett recalled that the defendant "knocked [her] into [her] nightstand and . . . over on [her] bed." She testified that he "slammed" her head into the headboard and then "got on top of" her, leaving only after the victim came to her aid. As a result, the defendant was convicted of child abuse and sentenced to eleven months, twenty-nine days, for which he was on probation at the time of the victim's murder.

The trial court applied the following enhancement factors: (2), that the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, and (6), that the defendant treated the victim with exceptional cruelty during the commission of the offense. See Tenn. Code Ann. § 40-35-114(2), (6). There were no mitigating factors. The trial court then fixed the defendant's sentence at twenty-five years, the maximum within the range.

Initially, the state contends that the defendant's Blakely claim was waived because it was not raised in the trial court. Recently, however, in State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, slip op. at 21 (Tenn. Crim. App., at Nashville, Oct. 4, 2004, as corrected Dec. 10, 2004), this court rejected the state's position:

> We acknowledge that Blakely extended Apprendi's holding that, under the Sixth Amendment, a jury must find all facts used to increase a defendant's sentence beyond the statutory maximum. However, nothing in Apprendi suggested that the phrase "statutory maximum" equated to anything other than the maximum in the range. To the contrary, the United States Supreme Court stated the issue in Apprendi as "whether the 12-year sentence imposed . . . was permissible, given that it was above the 10-year maximum for the offense charged in that count." 530 U.S. at 474, 120 S. Ct. at 2354. We also note that the Supreme Court has considered the retroactive effect of the holding in Ring v. Arizona, 536 U.S. 584, 592-93, 122 S. Ct. 2428, 2435 n.1, 153 L. Ed. 2d 556 (2002), as a new rule for capital cases even though it was based on Apprendi. See Schriro, ___ U.S. at ___, 124 S. Ct. at 2526-27. Perhaps this resulted from the fact that Ring overruled a case that had held the opposite. See Walton v. Arizona, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990). In this regard, with our own supreme court expressly approving our sentencing procedure under Apprendi, we have a difficult time faulting a defendant in Tennessee for not raising the issue before Blakely. We conclude that Blakely alters Tennessee courts' interpretation of the phrase "statutory maximum" and establishes a new rule in this state. The defendant's raising the issue while his direct appeal was still pending is proper.

> In any event, even if Blakely did not establish a new rule, the United States Supreme Court in Apprendi stated that the defendant's right to have a jury find facts that increase his sentence above the prescribed statutory maximum is rooted in his Fourteenth Amendment right to due process and his Sixth Amendment right to a jury trial. 30 U.S. at 476, 120 S. Ct. at 2355. In State v. Ellis, 953 S.W.2d 216, 220 (Tenn. Crim. App. 1997), this court held that although there was no common law right to waive a jury trial, Rule 23, Tenn. R. Crim. P., allowed a defendant to "waive a jury trial if the waiver is in writing and is knowingly executed." Absent a written waiver, "it must appear from the record that the defendant personally gave express consent [to waive a jury trial] in open court." Ellis, 953 S.W.2d at 221. Blakely, as an extension of Apprendi, also requires proof in the record that the defendant personally waived that right.

Because we are persuaded by the reasoning of the Walters court, we conclude, for the same reasons, that the defendant's Blakely claim in this case has not been waived.

The United States Supreme Court's opinion in Blakely calls into question the continuing validity of our current sentencing scheme. In that case, the Court, applying the rule in Apprendi v.

<u>New Jersey</u>, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. The Court observed that "the 'statutory maximum' for <u>Apprendi</u> purposes is the maximum sentence a judge may impose <u>solely on the basis of the facts reflected in the jury verdict or admitted by the defendant</u>." <u>Id.</u> at 2537. Finally, the Court concluded that "every defendant has a <u>right</u> to insist that the prosecutor prove to a jury [beyond a reasonable doubt] all facts legally essential to the punishment." <u>Id.</u> at 2543.

Under the rule established in <u>Blakely</u>, the defendant's prior convictions may be used to enhance the sentence. The record reflects that the defendant has a single prior conviction arising from the assault upon Ms. Jett. Factor (6), which was not based upon the defendant's prior convictions, was not admitted by the defendant. In consequence, the holding in <u>Blakely</u> would preclude its application. Under the rationale of <u>Blakely</u>, which controls, a sentence of twenty-two years, two years above the presumptive sentence, is warranted.

Accordingly, the defendant's sentence is modified to a term of twenty-two years. In all other respects, the judgment of the trial court is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE

-17-